ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

OCT 03 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Information |
| ATLANTA MEDICAL CENTER, INC. AND NORTH FULTON MEDICAL CENTER, INC. D/B/A NORTH FULTON HOSPITAL | No. 1:16-CR-350 |

THE UNITED STATES ATTORNEY CHARGES THAT:

**COUNT ONE**
**Conspiracy to Defraud the United States and**
**Pay and Receive Health Care Kickbacks and Bribes**
**(18 U.S.C. § 371)**

At all times relevant to this Bill of Information, unless otherwise stated:

## I.   THE RELEVANT GOVERNMENT PROGRAMS

### A.   The Medicare Program Generally

1.     The Medicare Program was created to pay for the costs of certain healthcare services. Entitlement to Medicare was based on age, disability or affliction with end-stage renal disease. Medicare was a "health care benefit program" and a "Federal health care program."

2.     The Department of Health and Human Services ("HHS") was a Department of the United States government. The Centers for Medicare and Medicaid Services ("CMS") was an agency of HHS and was directly responsible for the administration of the Medicare program.

3.      Part A of the Medicare Program authorized payment for institutional care, including hospital care.  In addition, hospitals that treated large numbers of low-income patients, including Medicaid patients, were able to seek additional federal funds through the Medicare Disproportionate Share ("DSH") program.

B.      The Medicaid Program Generally

4.      The Medicaid Program authorized federal grants to states for medical assistance to low-income, blind or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid Program was a jointly funded federal-state program and was administered, at the federal level, by CMS.  Within broad federal rules, each state determined eligible groups, types and ranges or services, payment levels for services, and administrative and operating procedures.  Medicaid was a "health care benefit program" and "Federal health care program."

5.      Medicaid providers submitted claims for payment to states.  The states paid the claims and obtained a portion of the monies used for payment from the United States Treasury.

6.      Undocumented aliens were not eligible for regular Medicaid coverage, but were eligible for certain types of Emergency Medical Assistance ("EMA") pursuant to 42 U.S.C. § 1396b(v).

7.      Medicaid provided payment for healthcare services provided to undocumented aliens if such care and services (1) were necessary for the treatment of an "emergency medical condition" and (2) if the patient met the financial eligibility requirements under the state's Medicaid plan.  42 U.S.C. § 1396b(v)(2)-(3).

8.     Emergency labor and delivery by undocumented aliens (who met state Medicaid financial eligibility requirements) was considered an "emergency medical condition" under the Medicaid Program pursuant to 42 U.S.C. § 1396b(v)(2)-(3). A child born to a woman approved for EMA for her delivery was eligible for "Newborn Medicaid."

9.     The Federal Anti-Kickback Statute, in general terms, criminalized the knowing and willful payment of remuneration, including bribes and kickbacks, to another in exchange for (1) referring a patient to a hospital for services that may be paid, in whole or part, by the Medicaid Program or (2) arranging for a patient to receive a service at a hospital where the service may be paid, in whole or part, by the Medicaid Program.

C.     The Georgia Medicaid Program

10.     As Georgia Medicaid providers, hospitals operating in Georgia were required to execute a "Statement of Participation." By signing a Statement of Participation, hospitals operating in Georgia agreed to follow Georgia's Medicaid rules in order to receive reimbursements from the Medicaid Program.

11.     The Georgia Medicaid rules, among other things, expressly prohibited paying remuneration directly, indirectly, overtly, covertly, in cash or in kind, in return for the referral of a Medicaid patient.

12.     The Statements of Participation further mandated compliance with all state and federal regulations, including the Federal Anti-Kickback Statute.

13.     In Georgia, hospitals participating in the Medicaid program submitted claims for payment for hospital services rendered to Medicaid patients to the Georgia Department of Community Health.  The claims were either submitted directly or through a State designee.

14. The Georgia Medicaid Program, as administered by the Georgia Department of Community Health, would not pay claims submitted by a provider hospital for patient services that it knew were the result of a violation of the Federal Anti-Kickback Statute.

D. The South Carolina Medicaid Program

15. As South Carolina Medicaid providers, hospitals operating in South Carolina were required to execute a contract with the South Carolina Department of Health and Human Services, commonly referred to as a provider agreement. By signing a provider agreement, hospitals operating in South Carolina agreed to follow certain rules in order to receive reimbursements by the Medicaid Program.

16. The South Carolina provider agreement entered into by hospitals operating in South Carolina mandated compliance with all state and federal regulations, including the Federal Anti-Kickback Statute.

17. In South Carolina, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid patients to the South Carolina Department of Health and Human Services.

18. The South Carolina Department of Health and Human Services would not pay claims submitted by a provider hospital for patient services that it knew were the result of a violation of the Federal Anti-Kickback Statute.

II. THE DEFENDANTS AND OTHER ENTITIES

19. Tenet Healthcare Corporation ("Tenet") was a publicly-held, Texas-based corporation that indirectly owned for-profit hospitals across the United States. Those hospitals included Defendant Atlanta Medical Center, Inc. (**"ATLANTA MEDICAL"**), Defendant North Fulton Hospital, Inc. d/b/a North

4

Fulton Hospital (**"NORTH FULTON"**), Spalding Regional Medical Center, Inc.
d/b/a Spalding Regional Medical Center ("Spalding"), and Hilton Head Health
System, L.P., d/b/a Hilton Head Hospital ("Hilton Head") (collectively, the "Tenet
Hospitals").

20.     Tenet HealthSystem Medical, Inc. ("Tenet Subsidiary") was a
Tenet subsidiary that owned for-profit hospitals in Tenet's Southern States Region,
including the Tenet Hospitals.  Tenet Subsidiary employed certain senior hospital
executives who worked at the Tenet Hospitals.  The Tenet Hospitals' senior
hospital executives reported to Tenet Regional Senior Vice Presidents of
Operations and Regional Vice Presidents of Finance Operations, who were also
employed by Tenet Subsidiary and who held themselves out as agents of Tenet.

21.     Defendant **ATLANTA MEDICAL** operated a for-profit hospital
located in Atlanta, Georgia.  **ATLANTA MEDICAL** competed with other
hospitals in the Northern District of Georgia for patients, including expectant
mothers.

22.     Defendant **NORTH FULTON** operated a for-profit hospital
located that was located in Roswell, Georgia.  **NORTH FULTON** competed with
other hospitals in the Northern District of Georgia for patients, including expectant
mothers.

23.     Spalding operated a for-profit hospital that was located in
Griffin, Georgia.  Spalding competed with other hospitals in the Northern District
of Georgia for patients, including expectant mothers.

24.     Hilton Head owned a for-profit hospital that was located in
Hilton Head, South Carolina.  Hilton Head competed with other hospitals in the

District of South Carolina and the Southern District of Georgia for patients, including expectant mothers.

25.   From at least March 2000 to at least 2013, **ATLANTA MEDICAL, NORTH FULTON**, and Spalding were enrolled as providers in the Georgia Medicaid program and billed and received payment from the Georgia Medicaid program for labor and delivery and newborn services.

26.   From at least March 2000 to at least 2012, **ATLANTA MEDICAL** was enrolled as a Medicare provider and sought and received additional reimbursement from the Medicare DSH program.

27.   From at least 2001 to at least 2013, **NORTH FULTON** was enrolled as a Medicare provider and sought and received additional reimbursement from the Medicare DSH program.

28.   From at least January 2006 to January 2012, Hilton Head was enrolled as a provider in the South Carolina Medicaid program and billed and received payment from the South Carolina Medicaid program for labor and delivery and newborn services.

29.   Hispanic Medical Management, Inc. d/b/a Clinica de la Mama ("Clinica") was a Georgia corporation.  From at least 1999 to in or around September 2010, Clinica held itself out as operating several medical clinics that provided prenatal care to predominantly undocumented Hispanic women in Georgia and South Carolina.

30.   In or around September 2010, Clinica's owners and operator divided the clinics between themselves and their respective successor companies, International Clinical Management Services, Inc. d/b/a Clinica del Bebe ("Clinica

del Bebe") and Company A.  Clinica, Clinica del Bebe, and Company A will hereinafter be referred to collectively as "Clinica."

## III.   THE CORPORATE INTEGRITY AGREEMENT

31.   In summer 2006, Tenet entered into a civil settlement agreement with the United States to resolve its False Claims Act liability arising from government investigations involving alleged fraudulent billing practices and Anti-Kickback Statute violations.  As part of the civil settlement agreement, Tenet entered into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services' Office of Inspector General ("HHS-OIG") in September 2006 to ensure that all Tenet facilities complied with Medicare and Medicaid Program requirements, including compliance with the Anti-Kickback Statute.  HHS-OIG agreed not to exclude Tenet from participating in the Medicare and Medicaid programs, conditioned on its compliance with the obligations in the CIA for five years.  The CIA covered Tenet, Tenet Subsidiary, and the Tenet Hospitals, including **ATLANTA MEDICAL** and **NORTH FULTON**.

32.   The CIA required, among other things, Tenet to strengthen its policies, procedures and controls for contracts with referral sources to ensure compliance with the Anti-Kickback Statute. The CIA also required certain employees who reviewed or approved contracts with referral sources, including the hospital CEOs and CFOs, to attend specialized training on referral source contracts during each year of the CIA.

33.   The CIA further required that Tenet submit certifications from "Senior Corporate Management," which included the Tenet Regional Senior Vice Presidents, to HHS-OIG as part of Tenet's CIA annual reports for each year of the 5-year CIA, certifying "[t]o the best of my knowledge, except as otherwise

described in the applicable report, Tenet is in compliance with the requirements of the Federal health care program requirements and the obligations of this CIA."

34.   The CIA further permitted HHS-OIG the right to examine Tenet's books, records, and documents and to conduct on-site reviews of Tenet's hospitals for the purpose of verifying and evaluating Tenet's compliance with (a) the CIA and (b) all Federal health care program requirements.

35.   In connection with Tenet's submission of its annual reports and certifications to HHS-OIG under the CIA, hospital CEOs and CFOs, among others, were required to certify that they had accurately and honestly completed quarterly certifications that required these executives to disclose, among other things, reportable events under the CIA.

36.   These certifications were among the books, records, and documents over which HHS-OIG maintained inspection rights.  These certifications also were relied upon by senior Tenet employees to certify that the requirements of the CIA had been completed and to confirm Tenet's operations complied with applicable Federal health care program requirements.

## IV.   THE FRAUD AND BRIBERY CONSPIRACY

### A.   Statutory Allegation

37.   From at least in or around 2000 through at least in or around 2013, in the Northern District of Georgia and elsewhere, and as described further below, (1) Clinica's owners and operators, (2) certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), acting as agents of the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), at least in part for the benefit of the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), and within the course and scope

of their employment and authority at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), and (3) others, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, and others known and unknown:

a)   To defraud the United States by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is:

b)   To violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) and (B) by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person: (i) to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia and South Carolina Medicaid programs; and (ii) to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, the Georgia and South Carolina Medicaid programs; and

c)   To violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) and (B) by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (i) referring an individual to a person

for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia and South Carolina Medicaid programs; and (ii) purchasing, leasing, ordering, and arranging for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, the Georgia and South Carolina Medicaid programs.

B.    Purpose of the Conspiracy

38.    The purpose of the conspiracy was for Clinica's owners and operators and others to unlawfully enrich themselves, and for certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) to unlawfully enrich and benefit the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), and themselves, by paying, and causing to be paid, and receiving illegal remuneration, including kickbacks and bribes, designed to induce Clinica's owners and operators to: (1) refer Clinica's Medicaid patients (the "Clinica patients") to the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**); and (2) arrange for services to be provided to Clinica patients and their newborns at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), all so that the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) could bill and obtain money from the Medicaid and Medicare DSH Programs for services provided to the Clinica patients and their newborns.

C.    Overview of the Conspiracy

39.    From at least in or around 2000 through at least in or around

2013, Clinica's owners and operators, certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), and others agreed that the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) would pay the owners and operators of Clinica bribes, kickbacks, and other unlawful remuneration in exchange for the owners and operators of Clinica (a) referring Clinica patients to the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and (b) arranging for Clinica patients to receive services at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**).

40.     To conceal from the government the true nature of the Tenet Hospitals' (including **ATLANTA MEDICAL's** and **NORTH FULTON's**) unlawful relationship with Clinica and to facilitate the further payment of bribes, kickbacks, and unlawful remuneration to Clinica, certain executives at the Tenet Hospitals and others falsified documents and records relating to Tenet's relationship with Clinica.

D.    Manner and Means of the Conspiracy

41.     As part of the scheme, certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and others understood that: (1) the owners and operators of Clinica were very successful at attracting pregnant, undocumented Hispanic women to its clinics for prenatal care and were able to control where these women delivered their babies; and (2) the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) could potentially realize a significant revenue stream from Medicaid and Medicare DSH payments for providing labor and delivery services to the Clinica patients and for providing services to their newborn babies.

42.    As a result, the owners and operators of Clinica, certain
executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH
FULTON**), and others, created and caused to be created contracts between the
Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and
Clinica.  Under these contracts, the Tenet Hospitals (including **ATLANTA
MEDICAL** and **NORTH FULTON**) purported to pay Clinica to provide various
services to the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH
FULTON**), including management services, marketing consulting services,
translation services, translation management services, Medicaid eligibility
determination paperwork, community outreach, educational classes, and birth
certificate services.  The true purpose of the relationship, however, was to induce
the owners and operators of Clinica to refer the Clinica patients to the Tenet
Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and arrange
for services to be provided to the Clinica patients and their newborns at the Tenet
Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**).

43.    The alleged services that were purported to be provided by
Clinica pursuant to these contracts were, in some instances, either:  (1) not needed;
or (2) duplicative of services already being provided; (3) substandard; or (4) not
rendered at all.

44.    In truth and in fact, the contracts were a pretextual mechanism
that allowed certain executives at the Tenet Hospitals (including **ATLANTA
MEDICAL** and **NORTH FULTON**) to cause the payment of over $12 million to
the owners and operators of Clinica in exchange for referring the Clinica patients
to the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**)
and arranging for services to be provided to the Clinica patients and their newborns

at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**).

45.    The owners and operators of Clinica were able to steer Clinica patients to particular hospitals, and arrange for Clinica patients and their newborns to receive services at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), based on: (1) their control of the patients who sought services from them; and (2) their leverage over the physicians who saw those patients in its clinics.  Although Clinica did not employ the physicians or other service providers, the owners and operators of Clinica controlled which physicians would be given time slots to see patients at the clinics, and could ensure that only physicians who agreed to deliver at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) were given slots.

46.    To further ensure that Clinica patients delivered at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), the owners and operators of Clinica allowed only physicians who had delivery privileges at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) to work in the clinics during particular times.

47.    Depending on what day a patient arrived for her initial visit, among other factors, the patient was assigned to a particular doctor and told where she would deliver her child. Clinica personnel would provide the patient with a Clinica identification (ID) card, which would be presented to the hospital where the patient delivered her baby.  The ID card listed both the physician to whom the patient had been assigned and the hospital where the patient was told to deliver her baby.

48.    To ensure that patients delivered at the Tenet Hospitals

(including **ATLANTA MEDICAL** and **NORTH FULTON**), and as part of the scheme, the owners and operators of Clinica made and caused to be made false statements and representations to Clinica patients. For example, in some instances, expectant mothers were told that Medicaid would only cover the costs associated with their childbirth and the care of their newborn baby if the expectant mother delivered at one of the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**). In other instances, expectant mothers simply were told that they were required to deliver their baby at one of the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), leaving expectant mothers with the false and mistaken belief that they could not select the hospital of their choice. As a result of these false and misleading statements and representations, along with others, many expectant mothers traveled long distances from their homes to deliver at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), placing their health and safety, and that of their newborn babies, at risk.

49. Throughout the life of the conspiracy, Tenet employed in-house lawyers and engaged outside lawyers to review and approve agreements between the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and Clinica. At various times throughout the conspiracy, certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and others concealed material facts from Tenet lawyers and outside counsel because they knew that the agreements would not be approved if the true nature of the Clinica arrangements were disclosed to the lawyers. In particular, certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and others concealed the fact that the true purpose of the agreements

was to induce the owners and operators of Clinica to: (1) refer Clinica patients to the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**); and (2) arrange for the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) to provide services to Clinica patients and their newborns.

50.    To facilitate the payment of monies to Clinica for the referral of the Clinica patients and arranging for the provision of services to Clinica patients and their newborns at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**) and others authorized or caused Tenet to (a) make payments to Clinica without valid contracts in place, and (b) make payment without supporting documentation or with inadequate documentation, in violation of then-existing company policies and controls governing the disbursement of monies to referral sources, such as Clinica.

51.    In connection with Tenet's submission of its annual reports and certifications to HHS-OIG under the CIA, certain executives at the Tenet Hospitals (including **ATLANTA MEDICAL** and **NORTH FULTON**), including **ATLANTA MEDICAL** Executives A and B, and **NORTH FULTON** Executives C and D, acting together and in concert, certified each quarter from in or around July 2008 to in or around October 2011, that they accurately and honestly completed quarterly certifications that required these executives to disclose, among other things, reportable events under the CIA. Those certifications were false and misleading because **ATLANTA MEDICAL** Executives A and B, and **NORTH FULTON** Executives C and D did not disclose, among other things, reportable events relating to Clinica under the CIA.

52.    In addition, from at least in or around 2007 to at least in or

around 2012, and in connection with Tenet's submission of its annual reports and certifications to HHS-OIG under the CIA, Tenet Regional Senior Vice President of Operations A, acting in concert with others, certified directly to HHS-OIG that Tenet was in compliance with all Federal health care program requirements and the obligations of the CIA. These certifications were false and misleading because Tenet Regional Senior Vice President of Operations A did not disclose, among other things, reportable events relating to Clinica.

53. As a result of this arrangement, the Tenet Hospitals received more than $125 million in Georgia and South Carolina Medicaid funds and more than $20 million in Medicare DSH funds for services provided to Clinica patients and their newborns at the Tenet Hospitals. Of that amount, **ATLANTA MEDICAL** received over $74 million in Georgia Medicaid funds and over $10 million in Medicare DSH funds. **NORTH FULTON** received over $48 million in Georgia Medicaid funds and over $12 million in Medicare DSH funds.

E.   Overt Acts

54. In furtherance of the conspiracy, and to accomplish its objects and purpose, the conspirators committed and caused to be committed, in the Northern District of Georgia and elsewhere, the following overt acts, among others:

a)   In or around July 2011, **ATLANTA MEDICAL** Executive A executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 2nd Quarter 2011 CIA Quarterly Certification.

b)   In or around July 2011, **ATLANTA MEDICAL** Executive

B executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 2nd Quarter 2011 CIA Quarterly Certification.

       c)    In or around July 2011, **NORTH FULTON** Executive C executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 2nd Quarter 2011 CIA Quarterly Certification.

       d) In or around July 2011, **NORTH FULTON** Executive D executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 2nd Quarter 2011 CIA Quarterly Certification.

       e) In or around October 2011, **ATLANTA MEDICAL** Executive A executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 3rd Quarter 2011 General Compliance Quarterly Certification.

       f) In or around October 2011, **ATLANTA MEDICAL** Executive B executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 3rd Quarter 2011 General Compliance Quarterly Certification.

       g) In or around October 2011, **NORTH FULTON** Executive C executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 3rd Quarter 2011 General Compliance Quarterly Certification.

       h) In or around October 2011, **NORTH FULTON**

Executive D executed a certification stating that, to the best of that executive's knowledge, the executive accurately and honestly completed the 3rd Quarter 2011 General Compliance Quarterly Certification.

      i) On or about October 11, 2011, **NORTH FULTON** Executives C and D caused Tenet to pay $20,667 to Company A for the benefit of NORTH FULTON.

      j) On or about October 27, 2011, **ATLANTA MEDICAL** Executives A and B caused Tenet to pay $26,957.70 to Clinica del Bebe for the benefit of ATLANTA MEDICAL.

      k) On or about November 10, 2011, **NORTH FULTON** Executives C and D caused Tenet to pay $24,379.50 to Company A for the benefit of **NORTH FULTON**.

      l) On or about November 22, 2011, **ATLANTA MEDICAL** Executives A and B caused Tenet to pay $25,972.20 to Clinica del Bebe for the benefit of Atlanta Medical.

      m) On or about December 8, 2011, **NORTH FULTON** Executives C and D caused Tenet to pay $21,409.50 to Company A for the benefit of **NORTH FULTON**.

      n) On or about December 29, 2011, **ATLANTA MEDICAL** Executives A and B caused Tenet to pay $22,818.60 to Clinica del Bebe for the benefit of Atlanta Medical.

o)   In or around January 2012, Tenet Regional Senior Vice President of Operations A certified directly to HHS-OIG that, to the best of that executive's knowledge, Tenet was in compliance with the requirements of the Federal health care program requirements and the obligations of the CIA.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

55.   Upon conviction of the offense charged in this Information, the defendants **ATLANTA MEDICAL** and **NORTH FULTON**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 18, United States Code, Section 24(a)(1), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to:

a)   A money judgment against **ATLANTA MEDICAL** in the amount of $84,696,727.00 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy to violate Title 42, United States Code, Sections 1320a-7b(b)(2)(A) & (B) and 1320a-7b(b)(1)(A) & (B) and to defraud the United States; and

b)   A money judgment against **NORTH FULTON** in the amount of $61,091,618.00 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy to violate Title 42, United States Code, Section s1320a-7b(b)(2)(A) & (B) and 1320a-7b(b)(1)(A) & (B) and to defraud the United States.

56.   If, as a result of any act or omission of the defendant, any property subject to forfeiture:

a)   Cannot be located upon the exercise of due diligence;

b)   Has been transferred or sold to, or deposited with, a third person;

c)   Has been placed beyond the jurisdiction of the Court;

d)   Has been substantially diminished in value; or

e)   Has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

All pursuant to Title 18, United States Code, Sections 24, 982(a)(7) and (b)(1), Title 42, United States Code, Sections 1320a-7b(b)(2)(A) & (B) and 1320a-7b(b)(1)(A) & (B), and Title 21, United States Code, Section 853(p).

Filed this 3rd day of October, 2016

JOHN A. HORN
UNITED STATES ATTORNEY

RANDY S. CHARTASH
CHIEF, ECONOMIC CRIME SECTION


STEPHEN H. McCLAIN
DEPUTY CHIEF,
ECONOMIC CRIME SECTION
Georgia Bar No. 143186

ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE


JOSEPH S. BEEMSTERBOER
DEPUTY CHIEF, FRAUD SECTION


ROBERT A. ZINK
ASSISTANT CHIEF, FRAUD SECTION
Washington, DC Bar No. 502694


SALLY B. MOLLOY
Georgia Bar No. 140816


ANTONIO M. POZOS
California Bar No. 254609
TRIAL ATTORNEYS
FRAUD SECTION, HEALTH CARE UNIT
CORPORATE STRIKE FORCE

21